618 So.2d 1335 (1993)
BAPTIST MEDICAL CENTER MONTCLAIR
v.
Myra WILSON, et al.
1911485.
Supreme Court of Alabama.
March 26, 1993.
*1336 William T. Mills II and H.C. Ireland III of Porterfield, Harper & Mills, P.A., Birmingham, for appellant.
Edward L. Hardin, Jr. and Belinda L. Kimble of Hardin & Tucker, Birmingham, for appellees.
HORNSBY, Chief Justice.
The defendant, Baptist Medical Center Montclair (the "Hospital"), appeals from a $600,000 judgment based on a jury verdict against it, and from a denial of a motion for a judgment notwithstanding the verdict, or, in the alternative, for a new trial or remittitur, in a medical malpractice action brought by Myra and George Wilson as the parents of Dana Jean Wilson, a deceased minor. We affirm.
The Hospital raises two issues on appeal: (1) whether the Wilsons complied with Ala. Code 1975, § 6-5-551, requiring pleading with specificity in medical malpractice actions, and (2) whether the Wilsons presented substantial evidence that the Hospital's negligent acts or omissions were the proximate cause of Dana Jean's death.
In 1985 Myra Wilson had twins delivered by cesarean section ("c-section"). Thereafter, she became pregnant a second time, and, on the advice of her physician, Dr. Ronald Orso of Birmingham Obstetrics/Gynecology P.A, she chose to attempt a vaginal birth. The risk in having a vaginal birth after a c-section ("VBAC") is the possibility that the scar tissue in the uterus, from the c-section, will rupture during the vaginal birth and cause "fetal distress," meaning injury to the fetus.
When, during the second pregnancy, Myra reported experiencing labor contractions, Dr. Orso recommended to the Hospital that it observe Myra as a VBAC patient to determine whether she was in active labor. The Hospital placed her under observation at approximately 12:55 a.m., November 23, 1987. At 1:00 a.m., nurse Barbara Caslin performed a vaginal examination on Myra and determined that her uterus was "tight finger tipped," meaning her cervix was not dilated. She, therefore, concluded that, even though Myra was complaining of contractions, she was not in active labor. Also at 1:00 a.m., Caslin began monitoring the fetus's heart rate. At that time, the rate was normal.
Caslin examined Myra again at 2:40 a.m. and found no change. At approximately 4:40 a.m., Myra told Caslin that she felt as though she needed to go to the bathroom. Caslin brought a bedpan, but Myra had no bowel movement. Ten minutes later Caslin removed the bedpan. Shortly thereafter, *1337 Myra experienced a sharp pain. Within moments, Myra and her husband noticed vaginal bleeding. He summoned nurse Ann Little from the nurses' station. Myra told Little that she felt as though her stomach had ripped open and the baby had moved up towards the ceiling. At approximately 5:20 a.m. Little performed a pelvic examination on Myra. She determined that Myra's cervix was completely dilated and that the fetus's heart rate had dropped to 60 to 70 beats per minute. She reported the findings of her examination to Dr. Orso, but she did not tell him about the ripping sensation Myra had reported or the vaginal bleeding Myra had experienced.
At approximately 5:36 a.m., Dr. Orso examined Myra. From his pelvic examination, Dr. Orso found that, contrary to Little's report, Myra's cervix was not dilated. He called for an emergency c-section at 5:46 a.m. At that time, nurse Caslin increased the oxygen supply to the fetus. At 5:59 a.m., Dr. Orso delivered Dana Jean by c-section. The surgery disclosed that Myra had suffered a catastrophic rupture of the uterus and fetal distress, meaning her scar tissue had torn and the fetus had been pushed from the uterus into the abdominal cavity, separating the placenta and compressing the umbilical cord.
Dana Jean died on April 22, 1988, as a result of brain damage she sustained during birth. On November 27, 1989, the Wilsons sued the Hospital, alleging that it had negligently failed to render appropriate medical care to Myra and Dana Jean during delivery and post-delivery. The Wilsons also sued Dr. Orso and Birmingham Obstetrics/Gynecology P.A., alleging negligence but, prior to trial, they negotiated a pro tanto settlement with those defendants.

I.
The first issue presented by the Hospital's appeal is whether the Wilsons complied with § 6-5-551. It provides:
"In any action for injury, damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care the plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial."
The Hospital argues that the judgment against it should be reversed because the Wilsons' complaint did not describe with particularity each act or omission alleged by the Wilsons, at trial, to be negligent. Instead, the Hospital says, the plaintiffs' trial expert, Dr. Michael Cardwell, testified to "a shotgun blast" of negligent acts, none of which had been specifically alleged in the Wilsons' complaint.
The Wilsons' complaint stated:
"[O]n or about November 23, 1987, ... Baptist Medical Center-Montclair [was] employed ... to render safe, adequate... medical care and prenatal care. Defendants did negligently render or fail to render proper medical care ... to Myra and Dana Jean Wilson.
". . . .
"Defendant, Baptist Medical Center-Montclair,... was negligent through its nursing staff in failing to determine that the baby, Dana Jean Wilson, was in breech position and could not be delivered in the position in which she was in. Further, that said defendant[] through its employees failed to take appropriate action once its employees learned of fetal distress and the breech position of the baby.
". . . .
"As a direct consequence of the negligence,... Dana Jean Wilson ... suffer[ed] brain damage."
The Hospital contends that the complaint specifically alleged only that the Hospital was negligent in failing to detect that Dana Jean was in a breech position, and it says, at trial, the Wilsons presented no evidence that the baby was in a breech position. Admittedly, the breech position of the baby was not an issue at trial. However, the *1338 allegation as to Dana Jean's breech position was not the only allegation specified in the complaint. The complaint also alleged that the Hospital "was negligent through its nursing staff in failing to determine that ... Dana Jean ... could not be delivered in the position in which she was in" and in failing "to take appropriate action once the employees learned of the fetal distress." The foremost negligent acts or omissions identified by the plaintiffs' expert at trial were the nurses' failure to detect and report to Dr. Orso the symptoms of uterine rupture, specifically, their failure to notify him of rectal pain and vaginal bleeding, their failure to notify him that the cervix had not dilated, and the nurses' failure to react properly in a fetal distress situation, particularly their failure to increase the oxygen supply to the fetus at 5:20 a.m. when its heart rate dropped. Additionally, the Wilsons' complaint identified the time and place at which the alleged negligence occurred and the resulting harm.
Further, the Hospital does not allege that a detailed specification and factual description of each act and omission alleged was not communicated to it. In its order denying the Hospital's post-judgment motion for a judgment notwithstanding the verdict, the trial court stated: "The defendant BMC was given adequate notice of the issue tried in this case, regarding the negligence of the BMC obstetrical nursing staff, in the pleadings and amplified in the pretrial order. The issues were discussed in detail at the pretrial conference." The pretrial order to which the trial court referred was the amended pretrial order, issued August 2, 1991. It stated: "Plaintiffs' Position. That Baptist Medical Center-Montclair failed to have adequate OB policies and procedures for handling patients such as Mrs. Wilson being permitted a trial of labor after having prior c-section; ... the nursing staff was negligent in that they failed to respond appropriately under the circumstances." On September 20, 1991, the Hospital deposed Dr. Cardwell. The trial began on February 11, 1992. From these facts, we infer that the Hospital knew, well before the 90 days contemplated under § 6-5-551, which acts or omissions Dr. Cardwell would identify as negligent.
For these reasons, we conclude that the Wilsons complied with § 6-5-551.

II.
We therefore turn to the second issue: whether the Wilsons presented substantial evidence that the Hospital's negligent acts or omissions were the proximate cause of Dana Jean's death.
The parties stipulated that Dana Jean died as a result of brain damage sustained during birth. To establish what standard of care was required of the Hospital's obstetrical nurses and how the Hospital's alleged failure to meet that standard caused Dana Jean's injuries, the plaintiffs presented expert testimony by Dr. Cardwell, the chief of obstetrics and director of maternal-fetal medicine at the University of Missouri. As chief of obstetrics, Dr. Cardwell trains nurses in the treatment of VBAC patients. The record shows that the Hospital knew Myra was a VBAC patient when it placed Myra under observation. Dr. Cardwell testified that the following acts or omissions by the Hospital's nurses were negligent:
"A. ... The nurse should have notified a physician of anything deviant from the regular course of labor.... Particularly, at around 4:40 [a.m.], when Mrs. Wilson complained of the rectal pain or pressure. In my opinion, at that point she was showing evidence of a uterine rupture that should have been related to Dr. Orso.... [Further], [t]he nurse, when she examined the patient at 5:20 [a.m.], ... did not ... evaluate the pelvic examination of Mrs. Wilson appropriately. The nurse described the cervix as being completely dilated; but, in actuality,... her cervix was not dilated. Based on the improperly performed vaginal examination, Dr. Orso proceeded to manage Mrs. Wilson in the way he did.
". . . .
"A. ... Another deviation from the standard of care is that at approximately 5:20 [a.m.], when the baby's heart [rate] *1339 dropped, ... the nurse should have started oxygen on Mrs. Wilson to get increased oxygen to the baby so the baby wouldn't have any difficulty with what we call hypoxia, or low oxygen, in the baby's blood system. However, the oxygen was not started until approximately 15 minutes after the heart [rate dropped].
". . . .
"A. ... It is the standard of care that when the fetal heart ... rate drop[s] down from the normal range, as it did in this case, ... oxygen is started automatically by the nurse without a doctor's order."
As to how the nurses' negligence delayed the c-section, he testified:
"A. ... [I]f a reasonable prudent obstetrician was given the correct status of Mrs. Wilson's cervix at 5:20 [a.m.], he would have delivered the baby by emergency cesarean section at that point."
Finally, as to how the injuries Dana Jean sustained during her birth ultimately caused her death, he stated:
"A. ... [W]hen the uterus finally completely ruptured at the end, the baby was extruded, or pushed out of the uterine cavity; and that a combination of the compression of the umbilical cord, and because the baby wasn't being surrounded by the bag of waters any more, and a separation of the placenta caused a decreased oxygen supply to the baby. The decreased oxygen supply caused brain damage in this particular baby, and that brain damage was so overwhelming that, eventually, the baby ... die[d]."
The Hospital argues that it is entitled to a reversal of the judgment against it because, it says, Dr. Cardwell's testimony did not establish, by substantial evidence, that the nurses' failure to detect and report to Dr. Orso the symptoms of uterine rupture was the proximate cause of Dana Jean's death. As support for its argument, the Hospital has extracted from Dr. Cardwell's testimony the following questions and responses and points out that Dr. Cardwell never stated that an earlier c-section would have saved Dana Jean's life:
"Q. ... Do you have an opinion based on a reasonable degree of medical certainty [as to] whether any of the deviation[s], that you have [ ]enumerated from the standard of care by the Hospital, ... contributed in any way to ... [Dana Jean's] death ... ?
". . . .
"A. Yes.
"Q. Would you tell the jury your opinion?
". . . .
"A. The nurses' negligent care of Mrs. Wilson and her baby led to a delayed cesarean section by Dr. Orso. If the nurses [had] related the information appropriately to Dr. Orso, he would have intervened earlier and delivered the baby by cesarean section."
Admittedly, Dr. Cardwell's response to this particular question was incomplete; however, his testimony, when taken as a whole, provided the jury with adequate evidence to allow it to find that the Hospital's failure to detect and report to Dr. Orso the symptoms of uterine rupture and the Hospital's failure to react properly to a fetal distress situation proximately caused Dana Jean's death.
Because we have concluded that the Wilsons complied with § 6-5-551 and that they presented substantial evidence at trial that the Hospital's negligent acts or omissions were the proximate cause of Dana Jean's death, we affirm the judgment against the Hospital.
AFFIRMED.
SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
HOUSTON and STEAGALL, JJ., concur in the result.
MADDOX, J., dissents.
HOUSTON, Justice (concurring in the result).
The complaint set out in the majority opinion did not comply with that portion of Ala.Code 1975, § 6-5-551, requiring "a detailed specification and factual description of each act and omission alleged by plaintiff *1340 to render the health care provider liable to plaintiff."
A fair reading of the complaint is that the "breech position of the baby" was the sine qua non of the plaintiffs' theory of liability, when it was not at all.
If the plaintiffs' theory of liability had not been modified by the pre-trial order, I would vote to reverse the judgment and remand the case; however, I am persuaded that a complaint can be amended by a pre-trial order to comply with § 6-5-551 and that the pre-trial order in this case was specific enough to comply with § 6-5-551. Therefore, I vote to affirm.
MADDOX, Justice (dissenting).
Amendment 328, § 6.11, Ala. Const. of 1901, provides in pertinent part, "The supreme court shall make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts ... These rules may be changed by a general act of statewide application." (Emphasis supplied.)
In 1987, the legislature adopted Act No. 87-189, Ala.Acts 1987, which was later codified as § 6-5-551, Ala.Code 1975. In full, § 6-5-551 provides:
"In any action for injury, damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care the plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Plaintiff shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief can be granted."
(Emphasis supplied.)
I believe that § 6-5-551 is "a general act of statewide application" that changes the Rules of Civil Procedure as they apply to medical malpractice actions against health care providers. As I see it, the clear legislative intent behind § 6-5-551 is to give defendant health care providers at least 90 days' pre-trial notice of a plaintiff's allegations against which they will be required to defend at trial. I agree with the majority and with Justice Houston, however, that this notice can come through a pre-trial order or amended pre-trial order, as long as that order is served on the defendants at least 90 days before trial.
Section 6-5-551 requires a plaintiff in an action against a health care provider to make "a detailed specification and factual description of each act and omission" allegedly breaching the applicable standard of care. Under § 6-5-551, a defendant is required to object to a complaint that is not clear, either by a Rule 12(b)(6), Ala.R.Civ. P., motion to dismiss or by an objection to the introduction of evidence at trial. My review of the record reveals that Baptist Montclair objected at trial to the Wilsons' introduction of testimony concerning alleged acts or omissions for which no timely advance notice, as required by the statute, was given. I must dissent today because, as I read the record, the trial court allowed the plaintiffs' expert to testify to acts and omissions not covered by the complaint and/or the amended pre-trial order. A comparison of the complaint and the amended pre-trial order with the plaintiff's expert testimony illustrates my point.
The complaint contains four basic allegations. These allegations read:
"[1] Defendants did negligently render or fail to render proper medical care within the standard of care to Myra and Dana Jean Wilson.
". . . .
[2] Specifically, plaintiffs aver that said defendants failed to perform a Caesarean section on a timely basis and said failure to perform a Caesarean section on *1341 a timely basis was a timely cause of injury to Myra Wilson which resulted in loss of oxygen, asphyxiation and severe brain damage, as well as other injuries to Dana Jean Wilson, deceased.
". . . .
"[3] Defendant, Baptist Medical Center-Montclair,... was negligent through its nursing staff in failing to determine that the baby, Dana Jean Wilson, was in breech position and could not be delivered in the position in which she was in.
"[4] Further, that said defendant[] through its employees failed to take appropriate action once its employees learned of fetal distress and the breech position of the baby."
(R. at 2-4; numbering supplied.)
Additionally, the amended pre-trial order mentions eight other allegations made by the plaintiff. These allegations read:
"[1] That Baptist Medical Center-Montclair failed to have adequate OB policies and procedures for handling patients such as Mrs. Wilson being permitted a trial of labor after having prior C-Section;
"[2] that at the time Mrs. Wilson was permitted a trial of labor, the delivery room was not set up for immediate C-Section, including availability of an anesthesiologist;
"[3] that Baptist Montclair's policies and procedures were inadequate in that it was determined Mrs. Wilson was in trouble, the doctor was notified, that no back up plan for immediate [action] in event the doctor was tied up with another patient or failed to respond to the call was existent or adhered to;
"[4] that Baptist Montclair failed to provide adequate nursing coverage;
"[5] a neonatologist was not notified or on the premises in the event a C-Section was required;
"[6] Baptist Montclair failed to provide adequate anesthesia coverage;
"[7] that the nursing staff was negligent in that they failed to respond appropriately under the circumstances; and
"[8] that Baptist Montclair was negligent in connection with contents of anesthesiology contract regarding availability of coverage."
(R. at 38-39; numbering supplied.)
In its brief to this Court, Baptist Montclair cites 16 alleged breaches of the standard of care to which the plaintiffs' medical expert testified. Basically, these 16 alleged breaches are as follows:
(1) that the patient was not properly prepared for her attempt at a vaginal delivery;
(2) that the nurse failed to advise Dr. Orso of the patient's desire for a C-section;
(3) that the patient was not properly set up for an attempt at a vaginal delivery;
(4) that the nurse should have requested an IV in case an emergency arose;
(5) that the nurse should have notified a physician of anything deviant from the regular course of labor;
(6) that the nurse did not appropriately evaluate the pelvic examination when she examined the patient at 5:20;
(7) that the nurses, upon Mrs. Wilson's admission to the hospital, should have perceived that she was in labor;
(8) that if Nurse Little had related to Dr. Orso the appropriate cervical status he would have acted differently;
(9) that the patient should have been typed and crossed for blood upon admission;
(10) that the nurse failed to get an order concerning cross-typing of the patient's blood;
(11) that the nurses failed to note the significance of the absence of contractions of the uterus while performing their examination of the plaintiff;
(12) that the nurse failed to recognize the signs or symptoms of a ruptured uterus;
(13) that if Nurse Little had notified the doctor of the cervical change, the bleeding and the decreased fetal heart tones, a reasonably prudent physician would have performed an emergency C-section earlier than one was performed;

*1342 (14) that the nurse should have started oxygen on Mrs. Wilson to get increased oxygen to the baby;
(15) that the nurses should have perceived appropriate signs of a ruptured uterus and that these signs should have been related to Dr. Orso; and
(16) that from all these deviations, the plaintiff's medical expert felt that the nurse and the hospital were negligent in caring for Mrs. Wilson and her baby during labor.
(See, Appellant's Brief at 13-14; R. at 446-47, 476-80, 488-90.)
By interpreting the complaint and the amended pre-trial order liberally in favor of the plaintiffs, I conclude that alleged breaches 1, 2, 6, 8, and 13 were arguably covered by the complaint or by the amended pre-trial order. Clearly, however, alleged breaches 3, 4, 5, 7, 9, 10, 11, 12, 14, 15, and 16 were not covered. I would reverse the judgment here because the trial court allowed the plaintiffs' expert to testify to alleged acts or omissions for which the defendants were not given the timely pre-trial notice required by § 6-5-551. Respectfully, I dissent.